UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FENG XUE; and CALCULUS TRADING TECHNOLOGY, LLC,

                       Plaintiffs,

-against-

STEWART KOENIG; and PRIME CONSULTING INTERNATIONAL, LLC,

                       Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/15/2022

No. 19 Civ. 07630 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiffs Feng Xue ("Xue") and Calculus Trading, LLC ("Calculus") (collectively, "Plaintiffs") initiated this action against Defendants Stewart Koenig ("Koenig") and Prime Consulting International, LLC ("PCI") (collectively, "Defendants"), asserting wage-related claims under the Fair Labor Standards Act (FLSA) and state labor laws. (Complaint, "Compl.," ECF No. 1.) Defendants answered by affirmative defenses and counterclaims sounding in tort and contract law. (ECF No. 9.)

Presently before the Court are (1) Defendants' motions to dismiss Plaintiff's FLSA claims for lack of subject matter jurisdiction and for summary judgment, respectively under Federal Rules of Civil Procedure 12(b)(1) and 56 (ECF Nos. 49-57); and (2) Plaintiffs' motion to dismiss Defendants' amended counterclaims (ECF Nos. 72-76).

For the following reasons, Defendants' motions to dismiss Plaintiff's FLSA claims for lack of subject matter jurisdiction and for summary judgment are DENIED. Plaintiffs' motion to dismiss Defendants' amended counterclaims is GRANTED.

1

## BACKGROUND

### I. The Wage Dispute[1]

At the center of this action is a wage dispute between Xue and Koenig. Xue is a software engineer and a resident of New Jersey. Koenig is a resident of New York and controls PCI, a New York staffing agency. (Compl., ECF No. 1.)

As a staffing agency, PCI specializes in "recruiting and placing information technology experts in the financial services industry." (Def Mot. at 7.) PCI itself does not provide the services provided by the professionals it recruits and places with its clients. (*Id*. at 7.) PCI submits that its clients "are in various areas of the financial services and technology industries and have a wide variety of staffing needs." (*Id*. at 7.) PCI's past clients include "PR Newswire," "Starwood Resorts and Hotels," "Direct Markets, LLC," "Caxton Associates," "JPMorgan Chase," "Citigroup," and "Maverick Capital." (*Id*.)

In 2005, non-party Bank of New York Mellon Securities Group[2] ("BNY" or "BNY-Cowen"), a securities trading firm, approached PCI about hiring an information technology ("IT") specialist for BNY's office in Iselin, New Jersey. (Koenig Declaration, "Koenig Decl.," ¶ 24, ECF No. 50.) Meanwhile, Xue posted his resume on an employment website, through which PCI contacted and interviewed Xue. (Xue Affirmation ¶ 6.) Following the interview, PCI hired Xue for the BNY position. (Koenig Decl. ¶¶ 24-25.)

PCI then proceeded to make two logistical arrangements with Xue regarding his employment with BNY, respectively referred to by the parties as (1) "Try and Buy" (Koenig Decl. ¶ 25); and (2) "corp. to corp." (Xue Affirmation ¶ 9). "Try and Buy" describes an arrangement

---

[1] The facts in this section are undisputed unless otherwise indicated.
[2] BNY merged with another financial service firm, ConvergEx Group LLC, in 2007. The merged firm was subsequently acquired by a different financial service firm, Cowen, in 2017. Throughout this series of mergers and acquisitions, Xue remained employed with the resulting entity in the same capacity as software engineer.

where Xue would first work for BNY-Cowen as an IT "consultant" on a temporary basis; if the temporary employment "works out," BNY-Cowen would then hire Xue on a full-time basis. (Koenig Decl. ¶ 25.) "Corp. to corp" refers to Koenig's suggestion that Xue set up his own limited liability company (LLC) and conduct all transactions with PCI through this one-person LLC. (Xue Affirmation ¶ 9.)

The "Try and Buy" arrangement was memorialized in an email from Koenig to Xue, dated June 24, 2005. (Koenig June 24, 2005 email, ECF No. 50-7.) The "corp. to corp." arrangement was also mentioned therein. The email states, in relevant part:

> As you [Xue] wish to be a full time employee of BNY and as BNY wishes to employ you, you will participate in a "Try and Buy" arrangement that will be facilitated by our company: [PCI]. During the 6 month "initial contract trial period" of this Agreement you will be working at BNY as a Sub-contractor supplied through PCI under the terms and conditions that follow. It is also understood that during this initial contract trial period you will subcontract to our firm PCI which will pay you as 1099 Employee, meaning that you will be liable for all your own taxes, benefits and expenses. It is also understood that during this initial contract trial period you may at your elect to assign this agreement with the same rights and conditions to your own Limited Liability Company.

(*Id*, ECF No. 50-7.)  Koenig's email further stated that Xue would (1) report to and under the direction of BNY-Cowen's designated manager; and (2) be paid at a rate of $55 per hour by PCI. Specifically, Xue was required to keep track of the hours he worked and submit a weekly report to PCI: "[a]s agreed [,] payments to you are tied to PCI's receiving payments from BNY[-Cowen]." (*Id*.)

Xue responded on the same day, confirming that he would start on July 5, 2005 at BNY-Cowen's Iselin, New Jersey office. (*Id.*) As suggested by Koenig, Xue set up an LLC, the Calculus Trading Technology ("Calculus"), to serve as the vehicle through which Xue rendered his service to BNY-Cowen and received payments from PCI. (Xue Affirmation ¶¶ 9-11.) Xue assigned to

3

Calculus the ownership of the title and copyrights to the software he developed for BNY-Cowen. (*Id*.)

From June 2005 to December 2017, Xue worked full-time as a software engineer for BNY-Cowen at Cowen's facility. (Def. Mot. at 5, ECF No. 52; Xue Affirmation ¶¶ 25-26.) Throughout this nearly thirteen-year period, BNY-Cowen's payments for Xue's service always flowed through PCI: Xue, through Calculus, invoiced and received payments from PCI regularly on an hourly basis. (Def. Mot. at 10-11; Xue Affirmation ¶ 19.) An email dated July 29, 2016[3] from Koenig to Xue indicates that PCI was able to independently raise Xue's hourly rate "without any help from [BNY-Cowen] on a rate increase." (Xue Affirmation Ex. C, ECF No. 53.) The record contains no information as to the payment arrangement between PCI and BNY-Cowen regarding Xue's services.

In December 2017, the Calculus-PCI, or rather, the Xue-Koenig relationship, came to an end. (Def. mem. at 10-11; Xue Affirmation ¶ 29.) Xue submits as exhibit an email from Koenig to BNY-Cowen personnel, dated January 17, 2018, which indicates that (1) BNY-Cowen "would like to hire Xue on a full time basis" and no longer through PCI as the intermediary; and (2) Koenig sought compensation from BNY-Cowen "for . . . the costs [PCI] will incur as a result of Cowen hiring away one of [PCI's] consultants[, Xue]." (Xue Affirmation Exhibit A, ECF No. 53.) Koenig's email further provides, in pertinent part:

> As I also explained we have a noncompete agreement with Steve that prohibits him from accepting offers of direct employment from our client(s). In order to facilitate his move to Cowen we will need to release him from that agreement. Again we are happy to do so provided we receive a placement fee as compensation. The

---

[3] The email states, in relevant part: "Hi Steve, I am not getting any help from [BNY-Cowen] on a rate increase. However, I do want to try and help as much as I can. I know you said your health care went up $6000/year and you want an increase as well. Accordingly I would like to increase you [sic] rate to $106/hour effective 8/1/2016. . . This equates to an increase of roughly $12,000/year. That is based on an [sic] 168 hours/month but you typically put in more time than that so it will actually be more . . ." (Xue Affirmation Ex. C, ECF No. 53.)

4

> calculation for the placement fee should be equal to 20% of Steve's his [sic] annual base salary as agreed with Cowen.

(Xue Affirmation Exhibit A.) While BNY-Cowen had paid PCI in full for Xue's services during the last three months of 2017, PCI admits that it did not render these payments to Xue. (Stipulation, ECF No. 50-14; Koenig Affirmation ¶ 52, ECF No. 50.) The parties further dispute the amount of the payments owed to Xue ("the Disputed Amount"). (Stipulation, ECF No. 50-14.) Xue claims that the amount owed to him is $65,549. (Compl. at 2.) Koenig claims that the Disputed Amount is $30,011. (Koenig Affirmation ¶ 53.) From these withheld wages arose the instant action.

## II. Contractual Counterclaims

On August 15, 2019, Plaintiffs Calculus and Xue commenced the instant action. (ECF No. 1.) On October 25, 2019, PCI and Koenig answered by filing of affirmative defenses and counterclaims sounding in tort and contract law. ("Counterclaims", ECF No. 9.) Defendants PCI and Koenig asserted in their counterclaims that Plaintiffs breached three out of the four contracts the parties entered throughout their 2005-2017 relationship, by either (1) initiating FLSA claims in this action; or (2) leveraging the specter of FLSA violations to take one of Defendants' clients, namely BNY-Cowen. (*Id.*)

The three underlying contracts, in chronological order, are: (1) a Noncompetition Agreement dated June 25, 2005 ("NA," Counterclaims ¶ 49; Pl. 12(c) Mem. at 8, ECF No. 74); (2) a Consulting Agreement dated July 1, 2009 ("CA," Counterclaims ¶ 39; Pl. 12(c) Mem. at 9); and (3) an Indemnification Agreement dated December 23, 2009 ("IA," Counterclaims ¶ 29; Pl. 12(c) Mem. at 9). On June 1, 2020, Plaintiffs moved for partial judgment on the pleadings, seeking to dismiss Defendants' breach of contract and declaratory judgment claims pursuant to Rule 12(c). (ECF No. 34.)

By Opinion and Order dated March 22, 2021, this Court granted in part and denied in part Plaintiffs' motion for judgment on the pleadings. ("O&O," ECF No. 66.)  Specifically, the Court (1) dismissed Defendants' claims under NA with prejudice after finding NA to be unenforceable (O&O at 17); (2) dismissed Defendants' claims under CA without prejudice due to the express terms' expiration, and granted Defendants leave to plead additional details regarding an implied-in-fact agreement (O&O at 19-20); and (3) reserved determination on Defendants' IA claims, because such determination was premature and turned on whether Defendants were Xue's employer for FLSA purposes (O&O at 11).

On April 8, 2021, Defendants filed their Amended Counterclaims alleging an implied-in-fact progeny to the expired express CA (ECF No. 67), to which Plaintiffs responded on April 28, 2021 (ECF No. 68.) On June 29, 2021, Plaintiffs submitted a letter motion requesting a premotion conference for a Rule 12(c) motion to dismiss Defendants' Amended Counterclaims (ECF No. 69), to which Defendants objected by letter motion on June 30, 2021 (ECF No. 70). By order dated on June 30, 2021, this Court denied in part and granted in part Plaintiffs' requests. (ECF No. 71.) Specifically, Plaintiff's request for leave to file a motion for partial summary judgment was denied without prejudice to renew at the end of discovery. (*Id.*) Plaintiff was granted leave to file a motion to dismiss: (1) claims relating to the CA; and (2) Defendants' promissory estoppel and tortious interference claims. (*Id*. at 2.) In accordance with the June 30, 2021 order, the parties filed their papers on September 14, 2021: Plaintiffs their motion to dismiss the Amended Counterclaims (ECF Nos. 73-74), and Defendants their opposition and reply papers (ECF Nos. 72, 75-76).

## LEGAL STANDARD

### A. Rule 12(b)(1)

A court properly dismisses a claim for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it, such as when ... the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms.,* 790 F.3d 411, 416-17 (2d Cir. 2015) (citations and quotation marks omitted). "[T]he 'irreducible constitutional minimum' of standing" requires that the plaintiff have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

"The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" each element of constitutional standing. *Id.* (citations omitted). Because "the elements of Article III standing are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Carter v. HealthPort Techs., LLC,* 822 F.3d 47, 56 (2d Cir. 2016) (citations omitted). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan,* 504 U.S. at 561.

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Id.* Such a motion is facial when it is "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Id.* In such cases, at the pleading stage, "the plaintiff has no evidentiary burden," *id.*, and the court accepts as true "all material allegations of the complaint and construe[s] the complaint in favor of the complaining party." *Cortlandt Street,* 790 F.3d at 417 (citations, quotation marks, and alterations omitted).

7

B. **Rule 12(c)**

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face." *Graziano v. Pataki,* 689 F.3d 110, 114 (2d Cir.2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The standard for analyzing a motion for judgment on the pleadings under Rule 12(c) is identical to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006); *see also* Fed. R. Civ. P. 12(b)(6).

In ruling on a motion to dismiss, a "court may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,* 602 F.3d 57, 64 (2d Cir.2010) (internal quotation and citation omitted). Courts may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

C. **Rule 56**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is

8

no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence [in] support" of such a contention. Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 Fed. Appx. 34, 36 (2d Cir. 2013) (summ. order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir. 1999). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson,* 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

## DISCUSSION

### I. FLSA Employee Status

Defendants aver that no employment relationship existed between Xue and PCI, and instead characterize Xue as an independent contractor. Plaintiffs maintain that Xue was a

"statutory employee" of PCI "as a matter of economic reality." (Pl. Opp. Mem., ECF No. 55.) Having now closely reviewed the parties' Rule 56.1 statements, accompanying exhibits and affidavits, and arguments,[4] the Court concludes that Xue and Calculus have produced sufficient evidence to demonstrate that Xue was an employee of PCI within the meaning of FLSA.

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). It further provides that an entity "employs" an individual under the FLSA if it "suffer[s] or permit[s]" that individual to work. 29 U.S.C. § 203(g). An entity "suffers or permits" an individual to work if, as a matter of "economic reality," the entity functions as the individual's employer. *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003) (internal citations omitted). The FLSA definition of "employee" is so expansive as to have been deemed "the broadest definition that has ever been included in any one act." *Zheng*, F.3d at 69 (citing *United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3 (1945) (quoting 81 Cong. Rec. 7657 (1937) (statement of Sen. Hugo L. Black)). FLSA employment encompasses "working relationships, which prior to [the FLSA], were not deemed to fall within an employer-employee category." *Id* at 69 (citing *Walling v. Portland Terminal Co.,* 330 U.S. 148, 150–51 (1947)).

The Second Circuit applies two different tests to determine whether an employment relationship exists under the FLSA: the joint employer test[5], and the *Superior Care* test. *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 80 (2d Cir. 2020) (citing *Zheng*, 355 F.3d 61.) Only the *Superior Care* test is applicable in the instant case. Crafted by the Second Circuit in *Brock v.*

---

[4] This Court previously indicated in the June 30, 2021 memorandum endorsement (ECF No. 71) that it "does not have an adequate record [to make the FLSA determination]" when it was still in the process of reviewing the record.

[5] The joint employer test applies when "when it is undisputed that the worker is already employed by one entity, but there is a question over whether that worker is also employed by the putative employer." *Id*. at 80 (citing *Zheng*, 355 F.3d at 67 & n.2) While Plaintiffs characterize PCI and non-party BNY-Cowen as Xue's joint employers, the parties do not raise a joint employer argument in their briefing for purpose of the instant motion. Accordingly, the Court applies the *Superior Care* test only.

*Superior Care, Inc*, 840 F.2d 1054 (2d Cir. 1988), the *Superior Care* test determines if "particular workers" are independent contractors and thus, by definition, "independent of all employers." *Id*.

Under the *Superior Care* test, five enumerated factors "bear on whether workers are employees or independent contractors: (1) the degree of control exercised by the employer over the workers ("control"), (2) the workers' opportunity for profit or loss and their investment in the business ("investment"), (3) the degree of skill and independent initiative required to perform the work ("skill"), (4) the permanence or duration of the working relationship ("permanence"), and (5) the extent to which the work is an integral part of the employer's business ("integration")." *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x at 76 (citing *Brock v. Superior Care, Inc*, 840 F.2d at 1058–59). The existence and degree of each factor is a question of fact. *Brock v. Superior Care, Inc.*, 840 F.2d at 1059. The legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law. *Id.* at 1059. The "ultimate concern" behind these factors is "whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x at 76.

Guided by *Brock v. Superior Care*, which also involves a staffing agency, the Court applies the five factors in turn and finds that the economic reality weighs in Plaintiffs' favor. With respect to the first *Superior Care* factor, control, the communication between Xue and Koenig makes clear that (1) PCI dictated Xue's initial hourly wage (Koenig June 24, 2005 email, ECF No. 50-7); (2) PCI set the terms of Xue's initial six-month "try" period (*id*.); (3) PCI required Xue to submit to PCI weekly hour report and Xue continued to do so over the course of the parties' relationship (*id*.; Xue Affirmation Ex. C, ECF No. 53); and (4) PCI retained its ability to unilaterally raise Xue's hourly wage in 2016, towards the end of the parties' relationship (Koenig July 29, 2016

11

email, Xue Affirmation Ex. C, ECF No. 53). While the parties concede that Xue never worked at PCI's site or under PCI's supervision, "[a]n employer does not need to look over his workers' shoulders every day in order to exercise control." *Brock*, 840 F.2d at 1060. In the instant case, the record demonstrated a substantial degree of control over the terms and compensation of Xue's employment by PCI.

The second *Superior Care* factor, investment, inquires whether Xue was so heavily invested in Calculus that he was "in business for [himself]." *Brock*, 840 F.2d at 1059. The record indicates that Xue invested but "labor itself"[6] in Calculus, a finding that PCI provides no information to refute.[7] Accordingly, the investment factor also weighs in Plaintiffs' favor.

As in *Brock v. Superior Care*, the third factor, Xue's skill, does not tip the balance in PCI's favor. *Brock*, 840 F.2d at 1060. Comparable to the nurses in *Brock*, software engineers such as Xue are skilled workers of specialized training, and yet nothing in the record indicates Xue "used these skills in any independent way." *Id*. at 1060. Instead, Xue worked full-time and exclusively through PCI. *See id.* at 1060 ("[T]he fact that workers are skilled is not itself indicative of independent contractor status. A variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees under the FLSA.") (citing as example *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 666–67 (5th Cir.1983); *Walling v. Twyeffort, Inc.,* 158 F.2d 944 (2d Cir.), *cert. denied,* 331 U.S. 851, 67 S. Ct. 1727, 91 L.Ed. 1859 (1947) (tailors); *cf. Donovan v. DialAmerica Marketing, Inc., supra,* 757 F.2d at 1387 (where

---

[6] *Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 144 (2d Cir. 2017) ("In the economic reality test, large capital expenditures—as opposed to "negligible items, or labor itself"—are highly relevant to determining whether an individual is an employee or an independent contractor.") (citing and quoting *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989)).
[7] Koenig and PCI redacted the entire section on this factor in its submissions. (ECF Nos 52, 56.)

distributors in home research business exercised "business-like initiative," in recruiting new home researchers, skill factor weighed in favor of independent contractor status).

The fourth factor, permanence, weighs heavily in Xue's favor. From June 2005 to December 2017, the relationship between Plaintiffs and Defendants lasted 150 months, or approximately 12.5 years. (Koenig Decl., ECF No. 50; Xue Affirmation, ECF No. 53.) This length far exceeds that of the relationships found to be FLSA employment in *Brock*, 840 F.2d 1054, and *Zheng*, 355 F.3d 61.

As to the fifth factor, integration, this Court follows the *Brock* Court and agrees with Plaintiffs: "the services rendered by [Xue] constituted the most integral part of [PCI's] business, which is to provide [IT experts] on request." *Brock*, 840 F.2d at 1059.

To address the ultimate concern behind the afore-analyzed five factors, Xue depended on PCI to render services for BNY-Cowen from June 2005 to December 2017 as a matter of economic reality. For twelve and a half year, PCI essentially "suffer[ed] and permit[ted]" Xue to work, for BNY-Cowen, but only through PCI. 29 U.S.C. § 203(g).  It is also clear from the record that PCI derived substantial economic benefit from Xue's services to such an extent that PCI attempted to extract from BNY-Cowen its anticipated loss from BNY-Cowen "hiring away" Xue. (Xue Affirmation Exhibit A, ECF No. 53.) Defendants' emphasis on the parties' references to Xue as "contractor," "subcontractor," and "consultants" is misplaced. The FLSA broadly defines employee to serve its remedial purpose, *see United States v.* Rosenwasser, 323 U.S. at 360, and justice will be ill-served if parties are permitted to label themselves out of the statute's reach.

Since the totality of circumstances reveals an employment relationship existed between Plaintiffs and Defendants within the meaning of FLSA, this Court has subject matter jurisdiction

13

over Plaintiffs' claims. *See* 28 U.S.C. § 1331. Further, because Defendants were Xue's FLSA employer, the Indemnification Agreement (IA) is void as against public policy.[8]

Accordingly, Defendants' motions for summary judgment and to dismiss for lack of subject matter jurisdiction are denied. In accordance with this Court's March 22, 2021 Opinion and Order, Defendants' IA claims are hereby dismissed with prejudice.

## II. Consulting Agreement

This Court's March 22, 2021 Opinion granted Defendants leave to re-plead an implied-in-fact Consulting Agreement (CA). Presently before the Court are Defendants' Amended Counterclaims ("AC," ECF No. 67) and Plaintiffs' Rule 12(c) motion to dismiss the AC (ECF Nos. 73-74).

As a threshold matter, Defendants' assertion that "[the] Indemnity Agreement, the Consulting Agreement, and the Non-Compete were all valid agreements enforceable under New York law" (AC ¶ 75) is clearly erroneous with respect to the "Indemnity Agreement" and the "Non-compete." First, the Non-compete, or NA, was already found to be unenforceable under the Statute of Frauds. (O&O at 15-17). Defendants' breach of contract and declaratory judgment claims under the NA have been dismissed with prejudice and this Court will not consider any

---

[8] In its March 22, 2021 Opinion & Order at 10-11, this Court reserved judgment on the IA pending the determination of Plaintiffs' FLSA employee status. This Court further states that if Defendants were determined to be Plaintiffs' FLSA employer, "then the [IA] is void as against public policy pursuant to [the following authorities]":
> The Second Circuit has held that "[t]here is no right of contribution or indemnification for employers found liable under the FLSA" because, among other things, "the text of the FLSA makes no provision for contribution or indemnification" and "the statute was designed to regulate the conduct of employers for the benefit of employees, and it cannot therefore be said that employers are members of the class for whose benefit the FLSA was enacted." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 144 (2d Cir. 1999), *holding modified by Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61 (2d Cir. 2003). "Subsequent decisions in this circuit have followed *Herman* and extended its reasoning to contractual indemnification claims[.]" *Garcia v. Cloister Apt Corp.*, No. 16 CV 5542-LTS, 2018 WL 1353274, at *2 (S.D.N.Y. Mar. 15, 2018); *see also Goodman v. Port Auth. of N.Y. and N.J.*, 850 F. Supp. 2d 363, 389 (S.D.N.Y. 2012) (granting motion to dismiss cross-claim for contractual indemnification in FLSA case because permitting indemnification would circumvent purposes of FLSA); *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311, 328 (S.D.N.Y. 2001).

(ECF No. 66.)

14

further claims predicated upon the NA. (O&O at 15-17).  Second, all claims under the "Indemnity Agreement," or IA, have now been dismissed with prejudice for reasons discussed in the preceding Section I.

With respect to the CA, Defendants allege that "Calculus accepted and agreed to be bound . . . by [the written CA]" (AC ¶ 77) and that the parties continued their dealings "as if [the CA] were in full force and effect." (AC ¶¶ 79-80.) Under New York law, the elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages. *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir.1998); *see also Roberts v. Karimi,* 251 F.3d 404, 407 (2d Cir. 2001) (stating that "a plaintiff in a breach of contract case must prove . . . that an enforceable contract existed"). After the expiration of an enforceable written contract, "the parties' conduct . . . *in accordance with the terms of the written contract*" can establish "a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract." *Andrews v. Sotheby Int'l Realty, Inc.*, No. 12 CIV. 8824 RA, 2014 WL 626968, at *8 (S.D.N.Y. Feb. 18, 2014), *aff'd*, 586 F. App'x 76 (2d Cir. 2014) (emphasis added) (citing *Watts v. Columbia Artists Mgmt. Inc.,* 188 A.D.2d 799, 591 N.Y.S.2d 234 (3rd Dep't 1992)). A new contract cannot be implied "if the circumstances create an inference that the parties did not intend to continue their relationship on the same terms." *Andrews*, 2014 WL 626968, at *8 (citing *Millenium Expressions, Inc. v. Chauss Mktg., Ltd.,* 02 Civ. 7545(JCF), 2007 WL 950070, at *6 (S.D.N.Y. Mar. 30, 2007)).

In the instant case, because the enforceability of the express CA is in dispute, it is insufficient for Defendants to merely plead, as they did in the AC, "the parties' conduct after the expiration of [the CA]." *Cf. Andrews*, 2014 WL 626968, at *8.  Even under Rule 8's simplified pleading standard, Defendants must still allege sufficient facts to establish that Plaintiffs

15

manifested assent to the unsigned written CA prior to its expiration, and thus, that an enforceable contract had existed on June 30, 2010. *See Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008); *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537, 2003 WL 23018888, at *4, *4–5 (S.D.N.Y. Dec. 22, 2003) (dismissing a breach of contract claim where insufficient facts were alleged to show an oral agreement existed). Stated differently, as alleged, no reasonable inference can be drawn as to an implied-in-fact agreement "with substantially the same terms and conditions as embodied in [the written CA]," if the written CA itself was never in effect in the first place. *Id*. at 8.

Accordingly, the Court grants Plaintiffs' 12(c) motion and dismisses Defendants' Amended Counterclaims without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's FLSA claims for lack of subject matter jurisdiction and for summary judgment are DENIED. Plaintiffs' motion for judgment on the pleadings with respect to Defendants' Amended Counterclaims are GRANTED. Specifically, all Defendants' Counterclaims predicated upon the Noncompetition Agreement, or "Non-Compete," have already been dismissed with prejudice by this Court's Opinion and Order dated March 22, 2021. (ECF No. 66.) All Defendants' Counterclaims predicated upon the Indemnification Agreement, or "Indemnity Agreement," are hereby dismissed with prejudice. Defendants' remaining Counterclaims, to the extent they are predicated upon the Consulting Agreement, are dismissed without prejudice.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 49 and 73. The parties are directed to notify Judge Krause of this Opinion and contact Judge Krause's chambers to schedule a conference.

Date: September 15, 2022

White Plains, NY

SO ORDERED:

_____
HON. NELSON S. ROMAN
UNITED STATES DISTRICT JUDGE